# THE SCHOOL SISTERS OF NOTRE DAME,
## A Corporation,

*vs.*

## REUBEN R. KUSNITT, Trading as Goodyear Hospital Rubber Company.

*Contracts: misrepresentation as to who was the vendor; stranger to contract no right to assume it.  Sale of goods: when merely keeping possession no equivalent to acceptance.  Baltimore Practice Act: failure to take judgment for amount admitted to be due.*

Where the agent of an individual represented to certain vendees that he represented a large corporation, whose name suggested the Goodyear Rubber Company, and as such induced them to sign a contract, as if with such presumed corporation, with which they intended to contract, when as a matter of fact, there was no such corporation existing, there was no contract.

p. 334

In such a case, where the goods were shipped to the vendees before they had found out that no such corporation existed, but the goods never had been opened, and no demand for the goods had been made by the vendor, and there had been no conversion by the vendees, nor refusal to return them, an action of assumpsit by the vendor for the value of the goods will not lie.

p. 342

A person has a right to contract with whom he pleases, and another cannot be thrust upon him without his consent; and he cannot be held to have contracted with a person other than the one he contemplated.

p. 340

In general, one person can not make another his debtor without the latter's consent.

p. 342

Under the Baltimore Practice Act, if the plaintiff fails to take a judgment for the amount that the defendant admits to be due, the defendant is not bound or estopped by his admission in the affidavit to the pleas. p. 341

*Decided February 10th, 1915.*

Appeal from the Superior Court of Baltimore City. (STUMP, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS. PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Harry M. Benzinger* and *Henry H. Dinneen,* for the appellant.

*C. Howard Millikin* and *Eli Frank* (with whom were *German H. H. Emory* and *C. John Beeuwkes* on the brief), for the appellee.

THOMAS, J., delivered the opinion of the Court.

This appeal is from a judgment recovered in the Superior Court of Baltimore City by Reuben R. Kusnitt, trading as Goodyear Hospital Rubber Company, against the School Sisters of Notre Dame, a corporation, for $900.00. The suit was on the common counts to which the defendant pleaded that "it was never indebted" and "did not promise as alleged."

Joseph S. Holstein, the only witness for the plaintiff, testified that he was the agent of the Goodyear Hospital Rubber Company and traveled "for them," and that on the 28th of October, 1913, he called at Notre Dame College, on Charles Street avenue, Baltimore, and asked for the Sister Superior. When Sister M. Florentine, the Sister Superior, appeared he exhibited to her samples of rubber goods, and after receiving from her an order for ice bags and water bags he talked with her and another sister about matting for the back stairs of the building. Sister M. Florentine sent for another sister to show him the stairs in order that he might measure them.

After he measured the back stairs he asked the Sister Superior "why they did not have the other stairs in front done at the same time." And she said "no; she could not afford that at the time." He told her the result of his measurement of the back stairs and the prices of the matting, and she asked him what it would cost, and he replied that he could not tell her, that no rubber man could tell her that in advance, but that it would cost thirty cents a pound. He then wrote the following order or contract which he and the Sister Superior signed:

"GOODYEAR HOSPITAL RUBBER COMPANY,
HARTFORD, CONN.

Goodyear's Famous Rubber Goods of Every Description.

Shipped via Penn. R. R. as soon as possible.

When              ship         Date   Oct. 28, 1913.
1%   10 days net 30 days.

Terms: Subject to sight draft without notice.

Sold to Notre Dame College,
          City, Charles St. Ave., State, Baltimore, Md.

All claims must be made
within one day after receipt
of goods or no allowance
will be made.

We, the above named Institution and Purchaser, Agrees to Take the Following Goods as Specified Below:

½ doz. M. W. B.....................$25 per dozen.
½ doz. Z. E. P. Ice Bags............. 15 per dozen.
260 pieces 5/16 (⅜) Plain Black Matting 11"x36",
    at 30c. per pound.

Special price:

  14 pieces 5/16 (⅜) Plain Black Mattings 8"x30",
    at 30c. per pound.
  12 pieces 5/16 (⅜) Plain Black Mattings 24"x36",
    at 30c. per pound.
  2 pieces 5/16 (⅜) Plain Black Matting 2"x36",
    at 30c. per pound.

1 No. 7 In. Ring, $1.50 Ea.

Bevel all edges. Send nails.

Frt. to be deducted Off of Bill.

1 Perf. mat. ½″ Thick 3′x3′; name in white N. D. M. as Donation.

No. chg. 1 perf. 5′x3′ Notre Dame College; white No Chg. as Donation.

Customers Should Read Contract Over carefully before signing and should obtain a duplicate from Agent. All goods are made special to order and cannot be cancelled under any condition.

N. B.—This contract is binding when signed by the customer, and the agent accepting same, by signing it binds the Goodyear Hospital Rubber Co.

       Name of Institution: Notre Dame College.

       Signature of Purchaser: Sr. M. Florentine.

J. S. HOLSTEIN, *Agent.*"

He further testified that he was at Notre Dame College about an hour and a half; that he did not know the name of the Sister Superior until she signed the contract; that the water bottles, ice bags and invalid ring were shipped to Notre Dame College by express and received by the defendant, and that the other goods mentioned in the order or contract were shipped by freight and tendered to the College; that it took 2980 pounds of matting to fill the order which at thirty cents a pound amounted to $894.00, and that the amount due plaintiff for the goods ordered was $900.15. On cross-examination he testified as follows: "Q. Who is the Goodyear Hospital Rubber Company? A. The Goodyear Hospital Rubber Company is a concern in Hartford, Connecticut, owned by R. R. Kusnitt. Q. Who did you tell the Sisters of Notre Dame the Goodyear Hospital Rubber Company was? A. I did not make any assertion who it was. Q. Did you tell the Sisters of Notre Dame who you represented? A. Yes; the Goodyear Hospital Rubber Company of Hart-

ford, Connecticut. Q. Did you tell them what it was? A. A rubber concern. Q. Did you tell the Sisters of Notre Dame at the time plaintiff's exhibit No. 1 (the contract or order for the goods) was signed that the Goodyear Hospital Rubber Company was a large firm or corporation in which you were interested as an officer? A. No, sir; I did not. Q. Didn't you tell them that the reason for your making these remarkable low prices for the goods offered to be sold was because the winter season was approaching and you had a large factory, and in order to keep the men employed during the winter you offered these prices which were virtually cost prices? A. I made the assertion that to keep our factory busy during the winter season, that was the reason I gave for these low prices and it was true; but any factory we buy goods of is our factory. Q. Then, as a matter of fact, at the time you made that statement to the sisters, you did not have a factory did you? A. We call it our factory when we are under contract to buy certain out-put. Q. Did Reuben R. Kusnitt on the 28th of October, 1913, own any factory? A. He did not own a factory. Q. There was no such corporation as the Goodyear Hospital Rubber Company? A. Well, we did not claim that it was a corporation. Q. Did you tell the School Sisters of Notre Dame at the time this contract was entered into that R. R. Kusnitt was the Goodyear Hospital Rubber Company? A. I did not, because I did not deem it was necessary. Q. Did you tell them at that time that you were selling these goods below their real value? A. I did, and so they were. Q. And didn't you tell them that the members of the corporation that you represented would raise a racket with you, but that you would stand for it, or words to that effect? A. I do not recall any such statement. Q. Didn't you tell them that you were selling these goods at that price so as to keep your men employed during the winter season? A. I did." After stating that the three sisters he mentioned were not together when the contract was signed; that it was signed "in triplicate"; that Sister Florentine left

the room while he was packing his goods, and that he left a signed copy of the contract in the room for her, he was shown the following letter which he said was a letter from the Goodyear Hospital Rubber Company:

"GOODYEAR HOSPITAL RUBBER Co.,

HARTFORD, CONN.

Goodyear's Famous Rubber Goods of Every Description.

Notre Dame College,           November 17th, 1913.
　　Charles Street Ave.,
　　　Baltimore, Md.
Rev. Sister M. Florentine, Supr.
　　Dear Madam:
　　Please find enclosed copy of your contract, which is exactly as the original. This matting is for your stairs in back of building. You will also find enclosed bill of lading for matting shipped today.

　　　　　　Respectfully yours,

　　　　　　　　GOODYEAR HOSPITAL RUBBER Co.,

RRK/H.　　　　　　By R. R. Kusnitt, Manager.
Enclosures."

The witness stated that that was the way the plaintiff usually signed; that the goods referred to were shipped from the warehouse of the plaintiff at 46 Village Street, Hartford, Connecticut, and further testified as follows: "Q. That is not your warehouse now? A. No, sir. Q. Who, as a matter of fact, manufactured these goods? A. The Goodyear India Rubber Glove Company of Maggatuck, Connecticut, manufactured part. Q. What part did the Goodyear India Rubber Glove Company manufacture? A. The sundry parts— the ice and water bags and the invalid ring. Q. And who manufactured the other part? A. The people who make the same stuff, the Goodyear—the genuine Goodyears. Q. What is the name of that concern? A. The Jersey Car Spring and Rubber Company of Jersey City, N. J. Q. They manufactured all the matting? A. Yes, sir. Q. Who are the 'genuine' Goodyear Rubber people? A. Well, there

are 150 Goodyears in the United States; that is an uncopy-righted name. Q. 150 of them in the United States? A. Yes; I guess you could count a thousand. Q. Well, why do you call them genuine if there are one hundred and fifty of them? A. That is too much for me to answer; they are all genuine."

Sister Mary Florentine, when asked to state the circumstances under which she signed the contract, said: "On the 28th of October, 1913, the portress telephoned to my office telling me that there was an agent in the parlor exhibiting rubber goods, or wanted to sell rubber goods. I came over and found Mr. Holstein there, and he showed me some ice bags and water bottles. I thought they would be of use in the infirmary. I sent for the infirmarian, Sister Mortana, and asked her if she would like to have some of them, and she stated that she would like to have one-half dozen of each. He spoke of the matting and told us what it cost. Then he said: 'In the meantime, you are going to take these anyhow, so sign for these.' I signed for the ice bags and water bottles, and so did he. Then Sister Mortana took him to the back stairs, and he came back again, and I don't know whether he told me how many steps there were, but I think there were about 130 to a stair. He said it would be $1.25 a step. I said: 'Oh, no; we could not spend that much money; it would be about $300.00,' and he said: 'Oh, no; it will not be more than $150.00 or $200.00.' Then I sent for Sister Meletia and spoke to her about it, and she advised not to do it, but he insisted it would not be over $200.00; so I sent him out with another sister to measure the stairs, and I thought he was about to fill out another paper when I was called out. I returned later and I found him on the way to the door. I went to the portress and asked her whether the man had left a paper for me and she said no." When asked if she got a copy of the order she said, "No, I got no copy; there was no copy left. I looked in the parlor where he was and there was no copy. Then it struck me that perhaps

he had written the order on the same paper which I had signed for the water bottles and ice bags, and I was very much troubled about it, and I wrote a registered letter to be sure that he would get it countermanding the whole order." Plaintiff's counsel was then asked to produce the letter, and he said he had no letter dated October 28th, but produced one dated October 29th, which the witness said was the letter she referred to and which is as follows:

"COLLEGE OF NOTRE DAME OF MARYLAND,
       CHARLES STREET AVE., BALTIMORE.

Goodyear Hospital Rubber Co.,
       Hartford, Conn.

Gentlemen: This morning a representative of your Company called regarding rubber goods. We gave him an order for ½ dozen ice bags and ½ dozen water bottles.

We also gave him an order for rubber for our *back* stairs. We had no idea that it would cost so much, but since he left we calculated and find it would be more than we can afford to spend for the next two years. We now recall the order for the rubbers for stairs. You may send us the water bags and the hot water bottles, but consider the order for the rubber for stairs cancelled for the present.

We may get it later, but not now.
                    Very truly,
Oct. 29th, '13."           SISTER MARY FLORENTINE."

Sister Florentine stated that the letter was written on the same day that the contract was signed, and that she received a reply to it from the Goodyear Hospital Rubber Company, but had mislaid it and could not find it. Counsel for the plaintiff produced the following copy of it, which the defendant offered in evidence:

"Hartford, Conn., October 30, 1915.
College of Notre Dame of Maryland,
       Rev. Sister Mary Florentine, Superior,
              Charles Street Ave., Baltimore, Md.

Dear Madam: We have just received your regis-

tered letter at 4.15 this afternoon, in which you state
that you wish to cancel your order for rubber matting
to some date in the near future.

We are very sorry we cannot comply with your
wishes, as your order has gone into the works last night
and stock is being made up for your contract and will
be ready for shipment within a few days, as our fac-
tory is working day and night.

You have bought these goods at a very low figure
and there ought to be no reason why they should not
last as long as the institution does.   The matting is
guaranteed for twenty-five years.

Thanking you for your kind order and hoping that
our business relations will be the same in the future
as they have been in the past, we beg to remain,

                     Respectfully yours,
                GOODYEAR. HOSPITAL RUBBER Co.,
                . . . . . . . . . . . . . . . . . . . . . . .,
                                    · Manager."


The defendant then offered in evidence further correspond-
ence with the Goodyear Hospital Rubber Company, in which
she asked for a copy of the contract, and then Sister Floren-
tine further testified that after she received the telegram she
sent two of the sisters up to Hartford, Connecticut, to make
inquiry concerning the company, as she was "very doubtful
about it"; that at the time she signed the contract the only
items it contained were the one-half dozen hot water bags
at $25.00 per dozen and one-half dozen ice bags at $15.00
per dozen; that she did not know that the other items were
put on that paper, but thought he was putting them on
another to be signed; that Mr. Holstein told her that the
matting for the back stairs would not cost $300.00 and per-
haps not $200.00; that there were about 130 steps in each
flight of stairs, or about 260 steps in the two flights, and
that at first he spoke of the matting costing about $1.25 a
step; that she calculated and saw that it would be about
$300.00, and he said, "Oh, no; possibly 50 or 75 cents each,

and they will not be more than $200 and possibly only $150"; that she did not receive a copy of the contract from the defendant until she received the bill for the goods and the bill of lading in the letter of November 17th, 1913; that when the goods arrived by freight she consulted an attorney, who advised her not to receive them, and that she then telephoned to the station and advised the railroad company to return them, and that she thought the railroad company had done so until a few days later when she received a postal from the terminal warehouse saying that the goods were there and would be sold at auction in a few days; that she then called up Camden Station and asked them why they did not return the goods, and they said that they had written to Hartford, but had gotten no answer; that at the time she ordered the goods Mr. Holstein told her that he was a member of the Goodyear Hospital Rubber Company; that he was the only one who could give them the rubber at such reduced rates, and that when he went back to Hartford they would call him down for it; that the reason he did it was because the factory had a great many men and they did not have much to do at that time of the year; that she asked him if the factory was in Hartford, and he said no, it was right outside of Hartford; that she never heard of Mr. Kusnitt, and never heard his name; that Mr. Holstein told her that the Goodyear Hospital Rubber Company was a company—a corporation—of which he was a member, and that she therefore ordered the goods from him. On cross-examination she stated that the School Sisters of Notre Dame is a corporation, and controls and operates the Notre Dame College; that she is the President and Treasurer of the College, and is called the Superior; that the only items in the contract when she signed it were the water bags and ice bags, and when asked if she had received them she said a box came to the college during her absence by express and was received by one of the sisters, probably the portress; that it had never been opened, and was still at the college, and that she had never

offered to return it to the Goodyear Hospital Rubber Company; that Mr. Holstein told her that the Goodyear Hospital Rubber Company was a company, or a firm, and that he was one of the members, and that it had a factory outside of Hartford; that he said he had a number of men engaged in the factory, and that they did not have much work to do at that season, and that that was the reason he could give her the rubber cheaper; that he said the company had the factory and that it was run by their men and that they paid them; that she could not say positively that he used the word "corporation," but that he did use the word "firm or company." The testimony of Sister Florentine in regard to the circumstances under which the contract was signed by her, and the items it contained when she signed it, etc., was corroborated by the testimony of the other two sisters who were present, and Sister Meletia, who was the Dean and Secretary of the college, further testified that she recollected very positively that Mr. Holstein said that the Goodyear Hospital Rubber Company "was a corporation"; that she inquired about the "peculiarity of the name," and that he said "a corporation had the right to any name that they liked"; that she asked how he could give rates that seemed to her "preposterous," and that he said he was allowed to do that because they "had a big concourse of men, and they were dull at that season, and it was better to get a little something than nothing"; that on November 13th she went to Hartford, Connecticut, taking Sister Mortana with her, to find out about the Goodyear Hospital Rubber Company, "because she felt convinced that there was some chicanery about the transaction, and she thought that if she could meet the president of the corporation she could have an understanding with him"; that she found no institution at all of that name, although she made careful inquiry; looked at the city directory and the telephone directory; went to every shop that had the word "Goodyear attached to it or where rubber goods were sold," inquired at the City Hall and at police headquarters, and asked "the head man at the Post

Office"; that while she was in Hartford she telephoned to Mr. Holstein's house, and spoke to a woman who said she was Mrs. Holstein, and that she told her that Mr. Holstein was in California or Wyoming and would not return for several months; that she asked her if there was not someone to represent him, and that she replied that unfortunately there was nobody in town; that she then asked her if there was not an office or warehouse or some place where she could meet the officials of the corporation, and that Mrs. Holstein replied there was a warehouse, but that it was very dilapidated and in a miserable part of the town.

During the trial the defendant reserved twenty-seven exceptions, the last being to the ruling of the Court below on the prayers and special exceptions to plaintiff's prayers, but in the view we take of the case it will only be necessary to consider one of them.

The evidence to which we have referred at some length shows conclusively that the sisters who made the contract in this case on behalf of the defendant thought they were contracting with and intended to contract with a *company or corporation* which owned a large factory in or just outside of Hartford, Connecticut, and employed a great number of men engaged in the manufacture of goods of the character mentioned in the contract, and it also shows that they were led to so believe by the statements and representations of the witness Holstein. It is true he denies that he said that the Goodyear Hospital Rubber Company was a corporation, but he admits that he told them that he represented a *company* of that name, and does not deny that he told them that the company had a factory just outside of Hartford, where it employed a number of men in manufacturing goods of the kind he offered to sell, and that he was willing to give them the goods mentioned at a reduced rate in order to keep its men employed during the winter season. That there was in fact no such corporation, company or factory, and that the sisters who represented the defendant in the negotiations never knew or heard of the plaintiff in this case until the

suit was brought, and never intended to contract with him must be conceded.

In *Anson on Contracts* (11th Ed.), sec. 183, the learned author, in speaking of "mistake as to the identity of the person with whom the contract is made," refers to the cases of *Boulton* v. *Jones* (2 H. & N. 564), and *Cundy* v. *Lindsay* (3 App. Cases, 459), as follows: "In *Boulton* v. *Jones,* Boulton had taken over the business of one Brocklehurst, with whom Jones had been used to deal, and against whom he had a set-off. Jones sent an order for goods to Brocklehurst; Boulton supplied them without any notice that the business had changed hands; when Jones learned that the goods had not come from Brocklehurst he refused to pay for them, and it was held that he need not pay. 'In order to entitle the plaintiff to recover, he must show that there was a contract with himself.' In *Cundy* v. *Lindsay,* a person named Blenkarn, by imitating the signature of a respectable firm named Blenkiron, induced AB. to supply him with goods which he afterwards sold to X. It was held that an innocent purchaser could acquire no right to the goods, because as between AB. and Blenkarn there was no contract. 'Of him,' says Lord Cairns, 'they knew nothing, and on him they never thought. With him they never intended to deal. Their minds never even for an instant of time rested upon him, and as between him and them there was no concensus of mind, which could lead to any agreement or contract whatever. As between him and them there was merely the one side to a contract, where in order to produce a contract, two sides should be required.' The result of the two cases is no more than this,—that if a man accepts an offer which is plainly meant for another, or if he becomes party to a contract by falsely representing himself to be another, the contract in either case is void. In the first case one party takes advantage of the mistake; in the other he creates it." In note 2 to page 169, it is said: "The same result follows if the seller is induced to contract with B. on his representation that he is acting as agent for a named person."

Mr. Benjamin in his work on *Sales of Personal Property* (3rd Ed.), section 74, after reviewing the English and American cases, says: "Where a person passes himself off for another, or falsely represents himself as agent for another, for whom he professes to buy, and thus obtains the vendor's assent to a sale, and even a delivery of goods, the whole contract is void; it has never come into existence, for the vendor never assented to sell to the person thus deceiving him." He then refers to certain cases where the contracts were held void, on the ground of fraud, and says, "but they were equally void for mistake." Mr. Brantly in the second edition in his work on *Contracts,* says: "It is well settled that if a man falsely represents that he is the agent of another and thus obtains possession of property, there is no sale and the transaction is void. In this instance the sellor intends to contract, not with the person before him, but with a principal, who is either non-existent or has not authorized the contract. There is, consequently, no meeting of minds between the sellor and buyer. The offer or declaration of will by the sellor is not met by a corresponding will on the part of any buyer, and the offer to sell not being made to the party present cannot be accepted by him." He says also "that where goods are ordered of one person and supplied by another, the latter has no claim against the purchaser *ex contractu* unless he appropriates them after notice of the substitution, in which case he assents to the change." The same rule is expressed in 9 *Cyc.* 401-402, as follows: "Mistake as to the identity of the other party arises where a person contracts with another believing him to be the one with whom he intends to contract, while as a matter of fact it is another person. Here, whether the mistake arises through the other's fraud, as when he falsely represents himself to be another, or accepts an offer which is meant for another there is no agreement. One who enters into an agreement has a right to know with whom he is agreeing, and when a person intends to contract with another he cannot be compelled to accept a third person as the other party to the contract." In *Humble* v. *Hunter* (17

L. J. Q. B. 350), LORD DENMAN announces the rule in the statement, "You have a right to the benefit you contemplate from the character, credit and substance of the party with whom you contract," and in *Arkansas Co.* v. *Belden Co.,* 127 U. S. 379, the Supreme Court says on page 387: "But every one has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent. In the familiar phrase of LORD DENMAN, 'You have the right to the benefit you anticipate from the character, credit and substance of the party with whom you contract.'" In the case of *Boston Ice Co.* v. *Potter,* 123 Mass. 28, the Court said: "To entitle the plaintiff to recover, it must show some contract with the defendant. There was no express contract, and upon the facts stated no contract can be implied. The defendant had taken ice from the plaintiff in 1873, but, on account of some dissatisfaction with the manner of supply he terminated his contract, and made a contract for his supply with the Citizens Ice Company. The plaintiff afterwards delivered ice to the defendant for one year without notifying the defendant, as the presiding judge found that it had bought the business of the Citizens Ice Company, until after delivery and consumption of the ice. * * * There was no privity of contract established between the plaintiff and defendant, and without such privity the possession and use of the property will not support an implied assumpsit. *Hills* v. *Snell,* 104 Mass. 173. And no presumption of assent can be implied from the reception and use of the ice because the defendant had no knowledge that it was furnished by the plaintiff. * * * A party has a right to select and determine with whom he will contract, and cannot have another person thrust upon him without his consent. It may be of importance to him who performs the contract. * * * In all these cases, as he may contract with whom he pleases, the sufficiency of his reasons for so doing cannot be inquired into. * * * If he had received notice and continued to take ice as delivered, a contract would be implied." In the case of *Edmunds* v.

*Merchants Transportation Co.,* 135 Mass. 283, "The swindler introduced himself as the brother of Edward Pape, of Dayton, Ohio. The plaintiffs understood they were selling, and intended to sell, the real Edward Pape," and the Court held that there was no contract with him, because the swindler who acted as his agent had no authority, and that there was no contract of sale made with any one, and that the relation of vendor and vendee never existed between the plaintiffs and the swindler. In the case of *Rodliffe* v. *Dallinger,* 141 Mass., p. 1, 4 N. E. 805, wool was delivered to a broker with the understanding that it was sold to an undisclosed manufacturer. It turned out that the broker in fact was not acting for the undisclosed principal and the Court held that there was no contract of sale. In the case of *Barnes* v. *Shoemaker,* 112 Ind. 512, 14 N. E. 367, where the goods ordered by one person were supplied by another, the Supreme Court of Indiana held that the acceptance and use of the goods, without notice that they were so supplied, would not warrant a recovery because "one of the indispensable elements of a contract—the mutual assent of the contracting parties" —was absent, and that to support a recovery for goods sold and delivered, there must be a contract, either express or implied, between the person who ordered and the one who supplied the goods. The cases of *Roof* v. *Morrisson, Plummer Co.,* 37 Ill. App. 37; *Consumers' Ice Co.* v. *Webster, etc., Co.,* 32 N. Y. App. Div. 592, and *Randolph Iron Co.* v. *Elliott,* 34 N. J. L. 184, are to the same effect. In this State the case of *Fifer* v. *Clearfield Coal Co.,* 103 Md. 1, is directly in point. There the contract was made in the name of the Cambria Coal Co. by one who represented that he was the agent of the company. The defendant was led to believe and thought that the Cambria Coal Co. was a corporation. The evidence disclosed that there was no such corporation, and that the agent in fact represented the plaintiff, Clarence A. Fifer, who was trading as the Cambria Coal Co. In disposing of the case JUDGE PAGE, speaking for this Court, said: "The testimony shows that the contract entered into

by the appellee was with the Cambria. Coal Co., which so
far as the record discloses was a fiction, not representing any
corporation or association.   It is clear from all the evidence
that the appellee and its agents, during the whole time the
negotiations for the sale of the coal was going on, thought
they were dealing with a corporation." After referring to
some of the evidence in the case he said further: "It is there-
fore clear that the appellee supposed it was dealing with a
corporation and not with an individual; and furthermore the
evidence will show that this belief on its part was induced by
the conduct of Deitrich, the agent of the appellant.   The
law applicable to such a state of facts, is thus stated in
*Anson on Contracts,* p. 163, 8th Ed.   Mistakes as to the
identity of the person with whom the contract is made,
'arise where A. contracts with X, believing him to be M.;
that is, where the offeror has in contemplation a definite
person with whom he intends to contract.'   The author cites
in support of this position, the case of *Boulton* v. *Jones,* 2
H. & N. 564; *Cundy* v. *Lindsay,* 3 App. Cases, 459. In the
latter case where 'a person named Blenkarn imitating the
signature of a respectable firm named Blenkiron induced AB.
to supply him with goods which he afterwards sold to X.
It was held an innocent purchaser could acquire no right to
the goods, because as between AB. and Blenkarn there was
no contract.' "   After quoting the statement of LORD CAIRNS
in that case, and citing the case of *Roof* v. *Morrisson, Plum-
mer Co., supra,* this Court further said: "The author in a
note adds, these cases must be distinguished from those where
B. deals with A., supposing A. to be acting for himself when
in fact A. is acting for an undisclosed principal X.

"Applying these principles to the undisputed evidence in
the case, it seems that the appellee was led to suppose that
it was dealing with a corporation. * * * It did not intend to
contract with an individual, and was mislead by Detrich in
so doing.   There was, therefore, no valid contract between
the appellee and the appellant, and the latter cannot main-
tain this suit."

It is urged on behalf of the appellee that a mistake as to the identity of the party with whom the contract was made only avoids the contract when it is material for one party to know with whom he is contracting and when he has a definite person in view. Of course the mistake does not arise where one of the parties has no definite person in view with whom he intends to contract. As said in *Anson on Contracts,* section 184: "It cannot arise in the case of general offers which any one may accept, such as offers by advertisement, or sales for ready money." But to hold that the rule only applies where the defendant can show that it was important for him to know with whom he was contracting, or that he had a reason for not wanting to contract with the plaintiff, would be to lose sight of the principle upon which the rule rests. If a person has a right to contract with whom he pleases, and another cannot be thrust upon him without his consent, he cannot be held to have contracted with a person other than the one he contemplated. In the case of *Boulton* v. *Jones, supra,* the defendant had a set-off against the party with whom he thought he was dealing, and in the case of *Boston Ice Co.* v. *Potter, supra,* it was urged that the rule should not apply unless there was a similar reason why the contract should not be enforced. In answer to this contention the Court in the latter case said: "The fact that a defendant in a particular case has a claim in set-off against the original contracting party shows clearly the injustice of forcing another person upon him to execute the contract without his consent, against whom his set-off would not be available. But the actual existence of the claim in set-off cannot be a test to determine that there is no implied assumpsit or privity between the parties. Nor can the non-existence of a set-off raise an implied assumpsit. * * * The implied assumpsit arises upon the dealings between the parties to the action, and cannot arise upon the dealings between the defendant and the original contractor, to which the plaintiff was not a party." In the case at bar the Sisters who represented the defendant never knew or heard of Reuben R. Kusnitt, but

thought they were contracting with and intended to contract with a company or corporation engaged in manufacturing goods of the kind they ordered. They had in view a definite person with whom they intended to contract, and as there was no such person or company there was no contract. This is not the case of dealing with an agent, supposing him to be acting for himself. Holstein represented that he was acting for a company or corporation which in fact did not exist.

The cases of *Stoddard* v. *Ham,* 129 Mass. 383, and *Clement* v. *British America Assur. Co.,* 141 Mass. 298, 5 N. E. 847, cited and relied upon by the appellee are not in conflict with the Massachusetts cases to which we have already referred. In *Stoddard* v. *Ham,* the Court said: "It was not a case of mistaken identity. The plaintiffs knew that they were dealing with Leonard; they did not mistake him for the defendant; nothing was said as to any other party to the sale. The conclusion is unavoidable that the contract was with him," and in *Clement* v. *British America Assur. Co.,* the Court said: "If A. deals with B., without any inquiry as to his identity, and in consequence of the dealing B.'s position is changed, as a general rule A. would be estopped from setting up that he supposed he was dealing with another person, and thus defeating the contract." It is quite apparent that these cases do not depart from the rule adhered to in the other Massachusetts cases referred to, and which applies to a case where the agent leads one to believe that he is contracting with a company or corporation that does not in fact exist.

The suit was brought under the Practice Act in force in Baltimore City, and as the defendant in the affidavit to its pleas admitted the plaintiff's claim to the extent of $21.50, the appellee contends that it is estopped from denying that it contracted with him. This contention, however, is fully disposed of in the case of *Laubheimer* v. *Naill,* 88 Md. 174, where this Court held that if the plaintiff fails to take a judgment for the amount admitted to be due, the defendant is not bound by his admission in the affidavit to his plea.

It is conceded that the express package containing the water bottles, ice bags and invalid ring, amounting to $21.50, was received by the defendant. But at the time the defendant received the package it did not know that it had been shipped by the plaintiff, and the evidence shows that it has never been opened and is still at the College. So far as the record shows there has been no demand by the plaintiff for these goods, and no conversion of or refusal to return them. As the defendant did not order or contract to purchase them from the plaintiff, and did not know, when they were received, that they had been furnished by him, there was no express or implied contract to pay for them, unless we are to hold that one person can make another his debtor without the latter's consent. In *Randolph Iron Co.* v. *Elliott, supra,* the Court held that where goods come into the possession of the defendant under such circumstances, assumpsit cannot be maintained unless the plaintiff shows that there has been a subsequent demand and a refusal or conversion of the goods. If the defendant had received the goods with the knowledge that they had been shipped by the plaintiff, or had appropriated them to its use after notice that they were furnished by him, or upon demand by the plaintiff had refused to surrender them a very different principle would apply. But the mere fact that they are in the possession of the defendant under the circumstances disclosed by the record does not impose upon it the burden of returning them, or establish an implied contract to pay for them.

It follows from what we have said that there was no evidence in the case legally sufficient to entitle the plaintiff to recover, and that the defendant's third prayer should therefore have been granted.

*Judgment reversed without a new trial;
with costs to the appellant.*