## SOUTHWESTERN MINES, INC., AND JONES *v.* P. & J. COAL COMPANY, INC.

[No. 420, September Term, 1965.]

*Decided October 14, 1966.*

The cause was submitted on the brief to HAMMOND, C. J., and HORNEY, MARBURY, OPPENHEIMER, BARNES and McWILLIAMS, JJ.

Submitted by *Edward J. Ryan* for appellants.

Submitted by *Lewis R. Jones* for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

In this appeal from the judgment on a "directed verdict" for appellee (defendant) we think it advisable to set forth the cast of characters so as to simplify the narration of the facts and to make them more easily understood.

David L. Jones (David)—22 years of age, secretary, treasurer and principal stockholder of Southwestern Mines, Inc.

Donald Jones (Donald)—brother of David.

David C. Jones (Casey)—father of David and Donald, owner or one of the owners of Casey Contracting Company and Jones Coal Co.

John Jones (Uncle John)—brother of Casey and uncle of David and Donald.

Evan Jones (Uncle Evan)—another uncle.

Jones Coal Co.—Whether corporation, partnership or proprietorship was not shown.

Casey Contracting Co.—Whether corporation, partnership or proprietorship was not shown.

Southwestern Mines, Inc. (appellant)—organized in New Mexico 16 June 1964. Qualified in Maryland 8 July 1964. Apparently owned and controlled by David.

P. & J. Coal Company, Inc. (appellee)—a Maryland corporation, a subsidiary of the John McCall Coal Company.

John F. Hubbard (Hubbard)—the superintendent of appellee although employed by the John McCall Coal Co.

John M. McCall, Jr. (McCall)—owner of the John McCall Coal Company.

In July 1964 appellee shut down its operations in the Grantsville (Garrett County) area. Hubbard told Donald he was "concerned" about moving a Lorain shovel to Keene Mountain, Virginia. Donald told David, who "took it from there." He went to see Hubbard at his home in Berlin, Pennsylvania. After some preliminary conversation Hubbard telephoned McCall who authorized him to arrange for the moving of the shovel at a price of $1,600. This was agreeable to David so Hubbard told him to "go ahead and move the shovel" and send the bill to McCall.

David loaded the shovel on two "lo-boy" trailers, one of which belonged to appellant. The other was rented from Uncle

Evan. The tractors used to haul the trailers also belonged to appellant. The loading was accomplished by David, Donald, Uncle John and "O. W. Phillips from Cumberland." Casey "gave them a hand" for "one day of the loading" but he was not employed by appellant. The loading and the movement occupied three or four days and "setting the machinery up again * * * [took] another couple days."

The bill from appellant to the John McCall Coal Co., dated 31 August 1964, was made up on a blank form. The amount was $1,600. It seems to be conceded that the shovel was moved and reassembled satisfactorily. On 11 September appellee mailed a check to the order of *appellant* for $790.53. This was returned to appellee by David. A letter of 19 September sent by counsel for appellant to appellee states, among other things, that "he [David] tells me you sent a check for $790.53 for this work deducting, as you informed him, [the amount] of an account which you stated was due to you from David C. [Casey] Jones."

At the trial, before Hamill, J., without a jury, Hubbard was produced as a witness for appellant. He said he "never heard anything about Southwestern Mines * * * [but that he] knew Casey Jones and Casey's son, David." Casey Jones was not in his (Hubbard's) home when the agreement was made but, he said, "he called me—on the telephone." The substance of this conversation was not related. According to Hubbard, David told him he and his father were in business. Even if true there is no evidence as to the nature of such a business. (There is no evidence Casey was in the hauling business.) Hubbard also claimed one of the tractors and one of the trailers belonged to Casey but he admitted he did not know who had the title and David testified all except the rented trailer were titled in appellant.

McCall, also produced by appellant, testified he authorized Hubbard to have the shovel moved, that he sent appellant a check for $790.53 and that the check was returned.

David admitted, while testifying, that Casey had been in the coal business in Garrett County "for quite a while" and that on occasions he helped him as any son might help his father. He did not tell Hubbard he was representing appellant because "he never asked." He did not know whether Casey had ever tele-

phoned Hubbard in regard to the contract. He knew Casey had done some business with appellee. The transaction, he testified, was entirely with appellant and the men who were employed in the moving of the shovel were paid by appellant. He said, because appellee refused payment, appellant "had to go out of business."

At the conclusion of the evidence offered by appellant counsel for appellee moved "for a directed verdict." This is not a proper motion. Maryland Rule 535 requires the use of a motion for a dismissal. *Smith v. State Roads Comm.*, 240 Md. 525, 539, 214 A. 2d 792 (1965).

Judge Hamill granted appellee's motion "for a directed verdict." His reasons for so doing have not been printed. Nevertheless, in pursuit of further enlightenment, we have examined the transcript and we find that the judge, in granting the motion for a "directed verdict," remarked that he might "file a written opinion in this case." Counsel for appellant said, "You will file a written opinion, will you, Judge?" Although the judge said he would file a written opinion ("it won't be very long" he added) we have been unable to find it in the transcript. Once more [1] we direct the attention of the bench and bar to the provisions of Maryland Rules 18 c and 564 b 2. It should be observed also that those rules contemplate a "motion" by the party requiring the statement of the grounds of decision which, as required by Maryland Rule 321 a, should be in writing.

It is possible to surmise from the colloquy (not in the printed record) at the conclusion of appellant's testimony that the judge felt David was obligated to disclose his representation of appellant because "he [David] dealt with them [appellee] in the past as Casey Jones" and that "defendant [appellee] understood, as he had done in the past, that he was dealing with Casey Contracting Company."

In its special plea on equitable grounds appellee took the position that the contract for moving the shovel "was actually made between Donald Jones and David C. [Casey] Jones, in-

---

1. *Reeves v. Howar*, 244 Md. 83, 222 A. 2d 697 (1966); *Kennedy v. Foley*, 244 Md. 39, 222 A. 2d 623 (1966); *Baltimore Machine & Equipment, Inc. v. Holtite Manufacturing Co.*, 241 Md. 36, 38, 215 A. 2d 458, 459 (1965); and *Houston v. Lloyd's*, 241 Md. 10, 13-14, 215 A. 2d 192 (1965) and cases therein cited.

dividually." Appellee offered no proof that this was so. Hubbard, who was called by appellant and not cross-examined by appellee, testified that, in the past, he had "arrangements with Casey Contracting Company." Later in his testimony he said the shovel "was moved by Casey Jones," but he admitted he had no personal knowledge of this. When asked if he hadn't told David and Donald to go ahead he replied, "Well, he [David] just said his father and he were in business." Such a statement, without more, is too equivocal to have any probative value, especially since David's testimony is to the contrary. We have not found in the record any support for the notion that David had ever dealt with appellee (or anyone else) as Casey Jones, Casey Contracting Co. or Jones Coal Co., nor have we found any support for the statement that Hubbard understood he was dealing with Casey Contracting Company. If appellee really thought its transaction was with (a) Donald and Casey, individually, or (b) Casey Contracting Company, or (c) Casey, we cannot understand why it would issue its check (less the set-off) to appellant.

Buried in the transcript is a bit of evidence (attached to appellee's exhibit No. 2) which impugns the notion appellee understood it was dealing with Casey Contracting Co. On a slip of paper is written "Rec'd—any royalties from Jones Coal Co." Beneath this there appears, in different handwriting, the following:

| Oct. | 1962 | 181.46 |
|------|------|--------|
| Dec. | 1962 | 259.07 |

$$\$440.53$$

Stapled to the slip of paper is an adding machine tape on which the following calculation is printed:

$$1250.00$$
$$440.53$$

$$809.47$$

$$1600.00$$
$$809.47$$

$$790.53$$

It is fairly inferable, we think, that Jones Coal Co. was mining coal belonging to appellee on a royalty basis and that, at the time, it owed appellee $809.47 ($1250.00—440.53). This amount was deducted from appellant's bill for moving the shovel. The difference ($790.53) is the amount of appellee's check. There is no evidence of a debt due appellee by Casey Contracting Co. Of course, Casey Contracting Co. and Jones Coal Co. may be nothing more than trade names used by Casey but there is no evidence of that either.

While we think there is a great deal more to this story than will be found in the record, it is certainly clear that the shovel was moved to appellee's satisfaction and that it owes $1,600 to some one for doing the job. It is equally clear that David did not represent himself, either directly or indirectly, to be the agent of Casey, Casey Contracting Co. or Jones Coal Co. Hubbard did not ask David if he was negotiating in a representative capacity and it is obvious he dealt with him either as a principal or as the agent of a principal whose identity was of no interest to him. He said, "I told him [David] to move it." He did *not* say, "I told him to tell his father (or his employer) to move it." The statements made by appellee in this connection are somewhat inconsistent. Appellee's formal position, as expressed by counsel in the plea on equitable grounds, is that its contract was with Donald and Casey. There is no evidence that Donald ever opened his mouth. Hubbard, at one point in his testimony, tried to infer that the contract was with Casey Contracting Company and, at another time, that it was with Casey. There is no evidence that Casey had any interest whatever in the contract or its performance except that he lent a hand for a few hours during the loading for which he was not compensated.

It is suggested, both by the trial judge and by counsel, that appellee would not have dealt with David (or his undisclosed principal) because it would not have been able to set off the $809.47 due it by Casey. There is no evidence that this is so and even if the vague and inconsistent statements of Hubbard can be considered as evidence they are negated by the issuance of the check which, it seems to us, is a clear unequivocal recognition of David's principal as the other contracting party.

The general rule, as set forth in Restatement (Second), *Agency*, § 320 (1958), is as follows:

"A person who makes a contract with an agent of an undisclosed principal, intended by the agent to be on account of his principal and within the power of such agent to bind his principal, is liable to the principal as if the principal himself had made the contract with him, unless he is excluded by the form or terms of the contract, unless his existence is fraudulently concealed or unless there is set-off or a similar defense against the agent."

Appellee contends that *Sisters of Notre Dame v. Kusnitt,* 125 Md. 323, 93 Atl. 928 (1915), is controlling. No other authorities are offered. As Judge Hamill obeserved, "This is a rather long case" and there is no need to discuss it in detail. It suffices to say that the situation in the instant case is different. Judge Thomas, who spoke for the Court, pointed out the difference quite succinctly:

"In the case at bar the Sisters who represented the defendant never knew or heard of Reuben R. Kusnitt, but thought they were contracting with and intended to contract with a company or corporation engaged in manufacturing goods of the kind they ordered. They had in view a definite person with whom they intended to contract, and as there was no such person or company there was no contract. *This is not the case of dealing with an agent, supposing him to be acting for himself.* Holstein [agent for Kusnitt, who traded as Goodyear Hospital Rubber Company] represented that he was acting for a company or corporation which in fact did not exist." *Id.* at 340-41. (Emphasis supplied.)

In the case at bar the existence of the appellant is not disputed. David's authority and capacity to act as its agent are not disputed. There is no reason, as far as the evidence is concerned, for supposing that appellee would not have been as willing and as quick to negotiate with appellant by name as it was

to contract with David, the agent. There is no doubt, in the circumstances, that it could set off a debt due by David, but that, of course, is not this case.

Except to call attention to the citations in the footnote,[2] we do not believe any useful purpose will be served by further discussion of the authorities. The trial judge should not have granted the oral motion for a directed verdict nor should he have granted a motion to dismiss had one been submitted. We think it likely that the production of testimony by appellee would have illuminated at least some of the dark corners of this case, enough, perhaps, to justify a finding for the appellee. However, if the case is retried and the parties offer no more evidence than is contained in the present record, then the court should have no difficulty in finding a verdict for the appellant.

*Judgment reversed.*
*Case remanded for a new trial.*
*Costs to be paid by appellee.*

---

2. *New York Sash & Door Co. v. National House & Farms Ass'n,* 131 N. J. L. 466, 36 A. 2d 891 (1944); *Ludwinska v. John Hancock Mut. Life Ins. Co.,* 317 Pa. 577, 178 Atl. 28 (1935); *P. J. Lawrence Lumber Co. v. Thomas & Proetz Lumber Co.,* 212 Mo. App. 256, 253 S. W. 783 (1923); *Clement v. British America Assur. Co.,* 141 Mass. 298, 5 N. E. 847 (1886); *Stoddard v. Ham,* 129 Mass. 383 (1880).